CUÉLLAR, J.,
Concurring.—It is well and widely known in legal circles— and codified in the statutes of this state—that only relevant evidence is admissible. (Evid. Code, § 350.) The rationale for the rule is as simple as it is important: Excluding irrelevant evidence furthers the goal of rational, impartial factfinding and decisionmaking by the jury.
Where the defendant’s life is at stake, the need for reliability is heightened. (Caldwell v. Mississippi (1985) 472 U.S. 320, 340 [86 L.Ed.2d 231, 105 S.Ct. 2633].) Courts must take special care in capital cases to ensure that the evidence offered at the penalty phase is relevant to the question of who should live and who should die. As we have long held, the focus of that individualized inquiry is the defendant’s character and the circumstances of the crime for which the defendant is being tried. (People v. Dyer (1988) 45 Cal.3d 26, 70 [246 Cal.Rptr. 209, 753 P.2d 1]; accord, Woodson v. North Carolina (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 96 S.Ct. 2978] (plur. opn. of Stewart, J.).) Evidence that is not relevant to either of those factors is not relevant to the penalty determination and should be excluded. (People v. Boyd (1985) 38 Cal.3d 762, 773-775 [215 Cal.Rptr. 1, 700 P.2d 782] (Boyd); see generally People v. Haskett (1982) 30 Cal.3d 841, 864 [180 Cal.Rptr. 640, 640 P.2d 776] [‘“irrelevant information . . . that diverts the [penalty] jury’s attention from its proper role . . . should be curtailed”].)
In distinguishing between what is relevant and what is not, courts must also bear in mind the differing rules governing the admissibility of aggravating and mitigating evidence. Although the jury must be allowed to consider any aspect of a defendant’s character or record that may be offered as a basis for leniency, there is no corresponding requirement that it also be allowed to consider every contention the prosecution might advance as a justification for the death penalty. (Boyd, supra, 38 Cal.3d at p. 775.) Rather, as the majority acknowledges (maj. opn., ante, at pp. 644-645), the evidence in aggravation is limited strictly to those factors enumerated in Penal Code section 190.3. (Boyd, at p. 775.)
*659 In this case, the trial court admitted evidence at the penalty phase that was not authorized by Penal Code section 190.3. Nor was it relevant to defendant’s character or to the circumstances of the crime for which defendant was being tried. Yet the majority finds no error. I respectfully disagree.
I.
Defendant murdered Cory Lamons in April 2004. He pleaded guilty to second degree murder in June 2006 and was sentenced to 45 years to life.
Three years later, defendant was charged with the 2002 murder of Scott Miller, which is the subject of this automatic appeal. At the penalty phase of the proceeding, Lamons’s mother, Sharon Thompson, was called to testify. Thompson was not a witness to her son’s murder, nor did she have any information about the circumstances of her son’s death or about the capital crime that led to defendant’s conviction in this proceeding. The prosecution called her to the stand instead to talk about how her son’s death had affected her life. Thompson’s testimony was plainly genuine—and heartfelt: “Well, first thing you do is you can’t believe that it really is happening to you. And then it feels like the air is being totally sucked out of the whole room. Then you keep thinking it really isn’t happening, that somebody is pulling a joke on you. [¶] Then the rest of your life you keep looking on the street thinking someone has pulled a really horrible joke on you and you are going to see him walking down the street. [¶] His sister helped raise him, and that was really horrible. And then the worst part of it is knowing that they died a violent death. Because you weren’t there to protect them. [¶] I miss him every day of my life. I actually moved out of the state after he died because I just couldn’t take it anymore.”
Thompson added that her grief never gets any better or any easier. When remembering her son’s birthday a week earlier at her workplace, she broke down and cried. And when asked how she had changed as a result of her son’s murder, Thompson reflected, “I think I am more closed up. I try not to let anybody get close to me. I don’t want to hurt like that ever again.”
II.
No one disputes that Thompson’s testimony would have been admissible at the sentencing hearing following defendant’s conviction for her son’s murder. (Pen. Code, § 1191.1.) Nor is there any doubt that her testimony would have been relevant as victim impact evidence at the penalty phase, had this capital proceeding been based on Lamons’s murder. (Pen. Code, § 190.3, factor (a); see People v. Cage (2015) 62 Cal.4th 256, 287-289 [195 Cal.Rptr.3d 724] [upholding the admissibility of testimony from the victim’s mother about the *660 impact of her daughter’s death].) The question here is different: whether Thompson’s testimony concerning her reaction to one murder was relevant to the jury’s penalty determination for an unrelated capital murder. So far as my research reveals, every other jurisdiction to have considered the admissibility of this category of evidence has concluded that it is not relevant. The majority’s decision to the contrary mistakenly conflates two distinct categories of evidence: evidence that tends to show the circumstances of an uncharged crime, and evidence of the uncharged crime’s effect on family or friends who were neither victims of nor witnesses to the crime. Our case law offers ample justification for the admissibility of the first category of evidence. Thompson’s testimony, however, falls in the second category.
A.
California’s death penalty statute provides that a defendant’s character and record, including the presence or absence of other violent criminal activity by the defendant, is relevant to the penalty determination. (Pen. Code, § 190.3, factor (b) (factor (b)); People v. Arias (1996) 13 Cal.4th 92, 193 [51 Cal.Rptr.2d 770, 913 P.2d 980].) As we have previously explained, “ ‘[t]he presence of such activity suggests that the capital offense is the product more of the defendant’s basic character than of the accidents of his situation, whereas its absence suggests the opposite.’ ” (People v. Ashmus (1991) 54 Cal.3d 932, 982 [2 Cal.Rptr.2d 112, 820 P.2d 214], quoting People v. Gallego (1990) 52 Cal.3d 115, 208-209, fn. 1 [276 Cal.Rptr. 679, 802 P.2d 169] (conc. opn. of Mosk, J.).) To aid in the determination of the connection between the charged murder and the defendant’s character, factor (b) allows the People to present the jury with not only the fact of the violent criminal activity, but also the “nature and circumstances” of the defendant’s violent conduct. (People v. Benson (1990) 52 Cal.3d 754, 797 [276 Cal.Rptr. 827, 802 P.2d 330] (Benson).)
At the penalty phase in Benson, supra, 52 Cal.3d 754, for example, the People offered testimony from four children whom the defendant had sexually assaulted or threatened to assault. Their heartbreaking testimony included an account of the suffering they had experienced and the emotional scars they continued to carry. (Id. at pp. 795-796.) We explained that the children’s testimony about the nature and circumstances of the crimes and the prosecutor’s related argument were “highly relevant to the life-or-death decision,” in that they tended to rebut the defendant’s attempt to minimize his culpability and his suggestion that the capital murder victims enjoyed the molestation. (Id. at p. 797.)
We drew a distinction, though, between two kinds of evidence: one kind concerning “the effect of such criminal activity on the victims” (the type of *661 evidence presented in Benson), and another involving indicia of “the emotional impact of such criminal activity on the victim’s family” (as in the case now before us). (Benson, supra, 52 Cal.3d at p. 797 & fn. 9; see also People v. Karis (1988) 46 Cal.3d 612, 641, 640 [250 Cal.Rptr. 659, 758 P.2d 1189] [similarly distinguishing between evidence showing “the impact of the crime on the victim” and evidence of the impact of the crime “on the family of the victim”].)[1] Evidence of the former kind can be relevant to the penalty determination insofar as it tends to illuminate the nature of the defendant’s act, beyond the simple fact that the defendant engaged in or was convicted of criminal activity involving the use of force or violence. (See People v. Jones (2012) 54 Cal.4th 1, 24-25, 72-73 [140 Cal.Rptr.3d 383, 275 P.3d 496] [evidence that the stabbing victim, a teacher at the defendant’s high school, quit teaching, was institutionalized for a period of time, and remained under psychiatric care 25 years later tended to show the viciousness of the attack and the victim’s vulnerability]; People v. Virgil (2011) 51 Cal.4th 1210, 1232, 1276 [126 Cal.Rptr.3d 465, 253 P.3d 553] [evidence that the stabbing and robbery victim underwent multiple surgeries and suffered persistent digestive difficulties, facial disfigurement, impaired vision, and sleeping difficulties tended to show the viciousness and extent of the attack]; People v. Bramit (2009) 46 Cal.4th 1221, 1228-1229, 1241 [96 Cal.Rptr.3d 574, 210 P.3d 1171] [evidence that the victims of armed bank robberies continued to experience fear tended to show the violence of the defendant’s conduct]; People v. Demetrulias (2006) 39 Cal.4th 1, 10, 39 [45 Cal.Rptr.3d 407, 137 P.3d 229] [evidence that the elderly victim of a stabbing and beating was no longer able to live independently tended to show the viciousness of the attack and the victim’s vulnerability]; People v. Holloway (2004) 33 Cal.4th 96, 143-144 [14 Cal.Rptr.3d 212, 91 P.3d 164] [evidence that the burglary and assault victim sought psychological treatment and purchased a handgun, which she kept under her pillow, tended to show the brutality of the defendant’s conduct]; People v. Price (1991) 1 Cal.4th 324, 479 [3 Cal.Rptr.2d 106, 821 P.2d 610] [questions calling for an emotional reaction from two peace officers, who were disarmed and forced into the trunk of their patrol car by the defendant, were not improper because “they could be understood as merely an assessment of the seriousness of defendant’s criminal conduct”].)
On the other hand, the grief of those who were neither victims of the crime nor witnesses to it is not relevant evidence of the nature or circumstances of the defendant’s violent activity. The majority does not directly address how the reactions of someone who did not witness or experience a crime could be a basis for making inferences about the nature of the crime. Instead, the *662 majority contends that it would be “anomalous” to allow victims of a defendant’s nonfatal criminal activity to testify while precluding testimony from the surviving family and friends of a homicide victim. (Maj. opn., ante, at pp. 648-649.) But there is no anomaly. Anyone—including surviving family and friends—who witnessed the criminal activity that is introduced under factor (b), whether as a victim or as an observer, may testify about the circumstances of that crime. (Cf. People v. Streeter (2012) 54 Cal.4th 205, 264 [142 Cal.Rptr.3d 481, 278 P.3d 754] [photographs of torture victim’s injuries and tape recording of victim’s screams in the ambulance were relevant to show the circumstances of the crime under Pen. Code, § 190.3, factor (a) as well as “the immediate impact of the crime on the victim”].) Such testimony could include evidence of the enduring physical or emotional impact of that crime, to the extent those effects tend to show the nature of a defendant’s acts. But factor (b) does not contemplate an inquiry into the emotional state of those who are complete strangers to a crime—indeed, it does not contemplate such an inquiry even if they are tied by kinship or friendship to those who were victims. Such testimony sheds no light on the vulnerability of the victim or the viciousness of the defendant’s conduct.
B.
The majority also analogizes Thompson’s testimony about the loss of her son to the victim impact testimony from surviving family and friends of the capital murder victim that the high court authorized in Payne v. Tennessee (1991) 501 U.S. 808 [115 L.Ed.2d 720, 111 S.Ct. 2597] (Payne), and that we recognized as a legitimate aggravating factor in Edwards, supra, 54 Cal.3d 787. Yet this analogy is unpersuasive, because it overlooks the legal distinction between information related to an uncharged crime and evidence that concerns the capital murder for which the defendant is on trial.
That distinction exists because the choice between death and life imprisonment without the possibility of parole properly rests on two—and only two—categories of evidence: the defendant’s character, and the circumstances of the capital murder itself. (People v. Dyer, supra, 45 Cal.3d at p. 70.) As part of the latter category of evidence, a jury may consider the “harm caused by the defendant as a result of the crime charged” (Payne, supra, 501 U.S. at p. 819, italics added), “the specific harm caused by the crime in question” (id. at p. 825, italics added), and “the human cost of the crime of which the defendant stands convicted” (id. at p. 827, italics added). The purpose of such evidence is to remind the jury that just as the defendant should be considered a “uniquely individual human being[]” (Woodson v. North Carolina, supra, 428 U.S. at p. 304 (plur. opn. of Stewart, J.)), so too is the victim an *663 individual to his or her family and to society in general. (Payne, at p. 825.) To withhold evidence about the capital murder victim would “prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder.” (Ibid.)
But Payne did not articulate a rationale for the admission of testimony concerning the emotional reactions of those who, while related to a victim of a defendant’s prior forcible or violent criminal conduct, are strangers to the capital crime, and the majority opinion offers none. Just as, in Price, it would not have been appropriate to call the spouses of the peace officers who were locked in their patrol car’s trunk to testify about the effect of their husbands’ ordeal on their own lives, Thompson’s feelings about her son’s murder were not relevant under factor (b) to the determination of the appropriate penalty for Miller’s murder. To be sure, Thompson’s feelings were genuine, profound, and indisputably painful and moving. But they shed no light on defendant’s conduct in killing her son or on the likelihood that the capital murder of which he was convicted was a product of his character rather than an accident of his situation.
It is not sufficient to assert, as the majority does, that factor (b) evidence encompasses “ ‘the circumstances of the prior violent criminal activity.’ ” (Maj. opn., ante, at p. 647.) To be admissible, the particular circumstances sought to be introduced must still be relevant to the jury’s task of fixing the penalty. (Evid. Code, §§ 210, 350; see St. Clair v. Commonwealth (Ky. 2014) 451 S.W.3d 597, 627, 631 [“evidence of the circumstances of [an uncharged] murder is qualitatively different from evidence of the crime’s impact on its victim,” the latter having “a complete failure of relevance”].) For purposes of factor (b), such circumstances are relevant only to the extent they tend to illuminate the nature of the defendant’s prior violent or forcible act.
The majority’s reasoning is also at odds with decisions in a number of our sister jurisdictions. (See Sherman v. State (1998) 114 Nev. 998 [965 P.2d 903, 914] [peace officer’s testimony about the effect an uncharged murder had on the victim’s community “is not relevant” to an aggravating factor or the circumstances of the charged murder]; Gilbert v. State (1997) 1997 OKCR 71 [951 P.2d 98, 117] [testimony from victims’ family members about the impact of uncharged murders was irrelevant to the penalty determination]; State v. Bigbee (Tenn. 1994) 885 S.W.2d 797, 812 [prosecutor’s argument concerning the impact of an uncharged murder on the victim’s family was error because the impact was “irrelevant” to the penalty determination].) The majority is quite correct that it is not bound by the abundant out-of-state authority rejecting its view, but the analysis in those cases seems more thorough and persuasive to me than what the majority provides.
*664 In People v. Hope (1998) 184 Ill.2d 39 [234 Ill.Dec. 379, 702 N.E.2d 1282], for example, the Supreme Court of Illinois overturned a penalty judgment on the ground that a widow was improperly allowed to testify about the loss of her husband. (Id., 702 N.E.2d at pp. 1287-1289.) The court determined that Illinois’s victims’ rights statute, which resembles our Victims’ Bill of Rights (Pen. Code, § 1191.1), did “not contemplate ... an expansion of victim impact statements to include evidence from victims other than the victims of the offense on trial.” (Hope, at p. 1287.) Nor did the Hope court find any other indication that the widow’s testimony could be relevant to the jury’s penalty determination: “Payne clearly contemplates that victim impact evidence will come only from a survivor of the murder for which the defendant is presently on trial, not from survivors of offenses collateral to the crime for which defendant is being tried.” (Hope, at p. 1288.) Thus, while the details of uncharged crimes can be proper aggravating factors, in that they illuminate the character and record of the capital defendant, the impact of those crimes on the relatives of the actual victims is “simply too attenuated to be relevant.” (Id. at p. 1289.)
The Supreme Court of Kentucky reached a similar conclusion in St. Clair v. Commonwealth, supra, 451 S.W.3d 597, which found error in the admission of a widow’s testimony about the impact of an uncharged murder. The court distinguished the widow’s testimony from the circumstances of the uncharged murder itself and concluded that her testimony was “a step too far removed to be relevant to sentencing for the crime being tried.” (Id. at p. 626.) Because the impact of the uncharged murder was “not a circumstance” of the charged crime nor “part of the character of the accused,” the admission of her testimony violated the Eighth Amendment and deprived the defendant of due process. (St. Clair, at p. 629 & fn. 19.)
And in Cantu v. State (Tex.Crim.App. 1997) 939 S.W.2d 627, the criminal court of last resort in Texas found error in the admission of testimony about the impact of an uncharged rape and murder on the victim’s mother. The court held that the mother’s testimony was not relevant to any matter of consequence in determining the penalty and that Payne “does not contemplate admission of such evidence as permissible under the Eighth Amendment.” (Cantu, at p. 637.)
Indeed, as best I can tell, we are now the only jurisdiction in the country to expand the scope of aggravating evidence in a capital trial to this extent. I recognize that California law allows the family and friends of a murder victim to explain, at the penalty phase of the capital trial, what that loss has meant to them, so as to provide the jury with a full picture of the harm *665 caused by the defendant “ ‘as a result of the crime charged.’ ” (Edwards, supra, 54 Cal.3d at p. 835.) California law also permits the jury to consider the defendant’s background and character, which can often be conveyed by the defendant’s use of force or violence in other situations. (People v. Nelson (2011) 51 Cal.4th 198, 222-223 [120 Cal.Rptr.3d 406, 246 P.3d 301].) To prove the extent of the defendant’s force or violence, California law authorizes the jury to consider a range of evidence: not just eyewitness testimony as to the defendant’s acts, but also evidence of the victim’s suffering—to the extent such evidence tends to illuminate how forceful, how violent, or how vicious the defendant’s acts were. (Cf. People v. Streeter, supra, 54 Cal.4th at p. 264.) But if we heed our duty to “ ‘ “strike a careful balance” ’ ” in this area (People v. Murtishaw (2011) 51 Cal.4th 574, 595 [121 Cal.Rptr.3d 586, 247 P.3d 941]), we should also conclude that evidence of the suffering experienced by those who did not witness or experience the defendant’s use of force or violence is simply not admissible at the penalty phase of a capital trial. Such evidence is relevant neither to the murder for which the defendant is on trial nor to establish his or her character.
The majority cites two cases in which the trial court nonetheless allowed relatives to testify about the effect an uncharged homicide had on their lives. (Maj. opn., ante, at pp. 648-649, citing People v. Johnson (2015) 60 Cal.4th 966 [184 Cal.Rptr.3d 612, 343 P.3d 808] and People v. Adams (2014) 60 Cal.4th 541 [179 Cal.Rptr.3d 644, 336 P.3d 1223].) In neither instance did the defendant challenge the relevance of the testimony, and we thus had no occasion to offer—and did not offer—any justification for its admissibility. (Johnson, at p. 993; Adams, at p. 573.) The majority likewise fails to support its conclusion that Thompson’s testimony was relevant to the choice of penalty. I therefore conclude, as have courts in every other jurisdiction to consider the question, that its admission was error.
I concur in the judgment, though, because I find that the error in the admission of Thompson’s testimony was harmless. Her testimony about the impact of the murder on her life was quite brief, about two pages in the reporter’s transcript. The jury instructions did not focus the jury’s attention on—or even mention—the impact of defendant’s uncharged conduct on surviving relatives. Finally, the ultimate impact of Thompson’s testimony likely paled in comparison to the voluminous aggravating evidence that defendant had killed three people in separate incidents, had a substantial record of violent conduct in and out of custody, and had attempted to orchestrate violent attacks even while he was in custody awaiting trial. So I find no reasonable possibility that her testimony affected the jury’s decision to sentence defendant to death, which, after all, was the verdict defendant *666 himself had requested. (People v. Enraca (2012) 53 Cal.4th 735, 765-766 [137 Cal.Rptr.3d 117, 269 P.3d 543].)
Liu, J., and Kruger, J., concurred.

 People v. Edwards (1991) 54 Cal.3d 787, 835 [1 Cal.Rptr.2d 696, 819 P.2d 436] (Edwards) asserted that Benson “strongly implies” that both types of evidence were admissible. But Edwards’a dictum was plainly inconsistent with the disclaimer in Benson and Karis and is entitled to no weight.