Filed 7/20/21  P. v. Balbuena CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B303752 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA104376) |
| v. | |
| JOHNNY BALBUENA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Affirmed as modified.

Mark Yanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an amended information filed by the Los Angeles County District Attorney's Office, defendant and appellant Johnny Balbuena was charged with the murder of Raymond Vasquez (Vasquez). (Pen. Code, § 187, subd. (a);[1] count 1.) Firearm and gang enhancements were also alleged.

Defendant was tried with codefendant Ulises Jose Gutierrez (Gutierrez), who had also been charged in the amended information with count 1, as well as two additional counts of murder (§ 187, subd. (a), counts 8 & 9) and three counts of attempted murder (§§ 664, 187, subd. (a); counts 5, 6 & 7). The jury found defendant guilty of first degree murder in count 1 and found it true that a principal personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d) & (e)(1)) and that the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The jury convicted Gutierrez of counts 1, 5, 6, 7, and 8, but found him not guilty of count 9.[2]

The trial court sentenced defendant to an aggregate term of 50 years to life, comprised of 25 years to life for the murder and an additional and consecutive 25 years to life for the firearm enhancement (§ 12022.53, subds. (d) & (e)(1)). The court also imposed a 15-year parole ineligibility term for the gang enhancement (§ 186.22, subd. (b)(5)).

In this timely appeal, defendant argues that (1) the trial court abused its discretion by denying defendant's motion to

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     We previously affirmed the judgment against Gutierrez. (*People v. Gutierrez* (May 25, 2021, B302264) [nonpub. opn.].)

sever his trial from Gutierrez's and that the subsequent joint trial violated due process; (2) the trial court committed instructional error by failing to sua sponte instruct the jury (a) not to consider evidence admitted on the counts not involving defendant and (b) that it must find each element of the charge in count 1 beyond a reasonable doubt; (3) cumulative error denied defendant due process; and (4) the trial court erred when it imposed a 15-year parole ineligibility term.

We strike the 15-year parole ineligibility term and impose a seven-year ineligibility term pursuant to section 3046, subdivision (a)(1).  As modified, the judgment is affirmed.

## BACKGROUND

I. *The People's Evidence*

    A.  <u>Count 1:  Murder of Vasquez (May 24, 2013)</u>

On the night of May 24, 2013, police responded to Main Avenue in Baldwin Park, where Vasquez, a member of the Eastside Bolen Gang, was found bloody and unresponsive in a driveway.  Vasquez was later pronounced dead at the scene.  The cause of death was multiple gunshot wounds.  Wolf 7.62 by 39 millimeter cartridge cases were recovered from the scene, and 7.62 by 39 millimeter bullets were recovered from Vasquez's body.  That type of ammunition is typical for an AK-47.

In August 2013, police searched the house of Elton Bennett (Bennett) and found a Wolf 7.62 bullet matching the casings found where Vasquez was murdered.

    1.  *Testimony of Arturo Mendoza (Mendoza)*

Mendoza, a member of the Northside Bolen Parque gang, testified that he was a passenger in a car driven by Gustavo Cruz (Cruz) in May 2013.  Mendoza and Cruz encountered defendant and Gutierrez, who were driving in a Mercedes near Main and

3

Olive in Baldwin Park.  Defendant was the driver, and Gutierrez was the front passenger.

From the car, Gutierrez asked Mendoza if he had a gun; Mendoza answered that he did.  Gutierrez replied, "'Me too.'" Mendoza told Gutierrez to follow them to the store.  As they drove, Mendoza saw a man standing outside of a house on Main. With the car stopped, Mendoza pointed his gun at the man and asked him where he was from—meaning, whether he was a gang member.  The man replied, "'Nowhere.'"

As Cruz and Mendoza started to drive away, Mendoza heard a single gunshot and then rapid fire.  Mendoza looked back and saw Gutierrez shooting the man with an AK-47 rifle.

Following the shooting, defendant, Gutierrez, Mendoza, and Cruz went to Bennett's house.  Gutierrez, who had brought the AK-47 with him, told Mendoza to "'[p]ut the gun away.'" Mendoza gave the AK-47 to Bennett, who put it in his garage. Everyone at Bennett's house, including defendant, "was excited."

2.  *Cruz's statements to undercover informants*

In a recording played for the jury, Cruz told undercover informants that he had been in one car and Gutierrez in another when Gutierrez shot a man.

3.  *Bennett's statements to undercover informants*

A recording of Bennett's conversation with undercover informants was also played for the jury.

Bennett told the informants that he had been "caught" with the same bullets from "the murder weapon, the AK[.]"  Regarding the murder, Bennett said that he "wasn't there, but after they smoked that fool they went straight to my house and . . . cleaned up and . . . put[] the strap away and everything."

4

Bennett explained that he had been sleeping when Mendoza called him and asked to come over with defendant, Gutierrez, and Cruz. At Bennett's house, Gutierrez—"the one that smoked this fool"—urinated on his hands to "clean the gunpowder." While in Bennett's living room, the group described approaching a man, asking where he was from, and Gutierrez shooting him repeatedly with an "AK." Bennett allowed the weapon to be placed in his garage. The next day, Gutierrez picked up the weapon from Bennett's house.

### 4. *The Mercedes*

Three days before Vasquez's murder, Kurt Miller (Miller) left the key fob to his Mercedes underneath the driver's seat so that his daughter could collect a gift that he had left in the car. His daughter retrieved the gift, but left the key fob in the car. Two days later, Miller noticed that the Mercedes had been stolen.

A Mercedes key fob was later found by officers in a cinder block outside of defendant's residence. The Mercedes was eventually located in West Covina, and the key fob discovered outside of defendant's residence was used to open the trunk. A "big chunk of plastic" was missing from the interior door of the Mercedes. A piece of plastic that had been found at the scene of Vasquez's murder appeared to fit the missing part of the door.

### B. Count 5: Attempted murder of Adrian Giron (Giron) (June 21, 2013)

At approximately 9:45 p.m. on June 21, 2013, a police officer found some clothing, impact rounds, and several .40 caliber bullet casings in the area of Clark and Alta Lake in Baldwin Park. Around the same time, another police officer responded to a hospital in Baldwin Park regarding "a victim sustaining gunshot wounds." In the emergency room, the police

5

officer encountered the victim, Giron, in "[a] lot of pain" with gunshot wounds on his left thigh and left arm.

### 1. *Interview of Yajahira Flores Arquellas (Arquellas)*

On August 24, 2013, Arquellas was interviewed by police detectives. Arquellas said that Stephanie Torres (Torres) picked her up in a small black car at approximately 10:00 p.m. on June 21, 2013. Torres then picked up Gutierrez, Torres's boyfriend. Torres drove to the area of Clark and Baldwin Park Boulevard and slowed down.

Gutierrez got out of the car and asked a man on the street where he was from. The man answered, "'CWA.'"[3] Gutierrez took out a handgun from his waistband and pointed it at the man. Gutierrez fired four rounds and returned to the car, yelling "'Northside Bolen. This is Northside[.]'"

### 2. *Arquellas's statements to undercover deputy sheriff*

In December 2013, Arquellas was serving time in jail for a probation violation. An undercover deputy sheriff pretending to be a fellow inmate was placed in a cell with Arquellas.

In a recording played for the jury, Arquellas told the undercover deputy sheriff that she was in a car with her daughter, Gutierrez, and Torres when Gutierrez shot someone— "a little youngster; 16 years old"—from the CWA tagging crew. Gutierrez had asked the man where he was from. The man said: "'C Dub A.'" Gutierrez responded: "'What? Fuck C Dub A. Northside Bolen.'" Gutierrez started shooting "with a nine millimeter," hitting the man twice.

---

[3]     "CWA" stands for "Crazy Wicked Artists" or "Crazy Wicked Assassins" and is a "tagging crew" in Baldwin Park.

C.  Count 6:  Attempted murder of Maria Moreno (Moreno) (October 2, 2013)

Moreno was an influential member of the Northside Bolen Parque gang since the 1970's.  On October 2, 2013, a police officer responded to a hospital, where he saw Moreno being treated for extensive wounds, including deep lacerations to her body and face.

Gutierrez was arrested in January 2014 and placed in a jail cell with two undercover informants.  Gutierrez's conversation with the undercover informants was recorded and played for the jury.[4]

Gutierrez told the undercover informants that he blamed "two bitches" for the death of his "homie[.]"  One of them was "older" and "could be [Gutierrez's] grandma."  She "got stabbed up[.]"  Later in the conversation, Gutierrez said that "Maria" had "got shanked up."  Gutierrez said that he "was this close to kill [*sic*] her" but was stopped.

D.  Counts 7 and 8:  Attempted murder of Jonathan Maldonado (Maldonado) and murder of Maurio Sotelo (Sotelo) (July 19, 2013)

At approximate 12:30 a.m. on July 19, 2013, police responded to Feather Avenue in Baldwin Park and found Maldonado, a member of the Eastside Bolen Parque gang, lying on the ground on a front porch.  Maldonado had suffered a bullet wound to his upper chest.

Approximately 45 minutes later, police responded to the area of Los Angeles Street and Merced Avenue in Baldwin Park, where they found Sotelo bleeding and unresponsive on a bus

---

[4]    Details about Gutierrez's statements to the undercover informants are discussed later in this opinion.

bench.  Paramedics arrived and pronounced Sotelo dead.  The cause of death was a gunshot wound to the neck.

In a recording played for the jury, Francisco Moran (Moran) told undercover informants that he had been driving at about midnight with Gutierrez and two other people as passengers when they saw "two fools walking."  Gutierrez "hop[ped] out on them[.]"  Gutierrez shot one of the men, but "he didn't die."  The other man "ran away[,]" but Moran shot him two to three times at a bus stop at the corner of Merced and Los Angeles.

E.  Count 9:  Murder of Louis Quintanilla (Quintanilla) (July 25, 2013)

On the night of July 25, 2013, Aracely Vasquez was inside her home on Merced Avenue in Baldwin Park, while her husband was outside talking to Quintanilla.  She heard someone outside ask, "'Where you fools from?'" followed by multiple gunshots.  After hiding in the back of her home with her children for a few minutes, she went outside and saw Quintanilla laying in the driveway with a severe gunshot wound to his face—"like no flesh on his face[.]"  Quintanilla died.

Mendoza testified that Gutierrez told him that he had shot somebody from KHA, a rival Baldwin Park gang, with a shotgun on Merced.

Only one shotgun homicide occurred on Merced Avenue in 2013.

F.  Gutierrez's statements to undercover informants

While investigating Vasquez's murder, the Los Angeles County Sherriff's Department conducted a *Perkins*[5] operation, which entailed placing an undercover agent posing as an inmate

---

[5]     *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

in a cell with a suspect to elicit incriminating statements. Gutierrez was one of several subjects of the *Perkins* operation.

Following his arrest on January 16, 2014, Gutierrez was placed in a jail cell with two undercover informants. Gutierrez told the informants that he was from the Northside Bolen gang. He explained that he was being implicated in a murder and that someone was "snitching[.]" One of the informants suggested that he could do Gutierrez "a favor" regarding the witness. (Italics omitted.)

Gutierrez was removed from the cell for additional interviews with law enforcement. When he returned, he told the informants that he was now being implicated in other murders and attempted murders, and was facing the death penalty. One of the informants again suggested that he could kill the witness but could not make any promises. The informant told Gutierrez: "[I]f I find the fool for you, if I whack him, you're gonna owe me a favor. You know that; right?" (Italics omitted.) Gutierrez responded: "I'm a rider, dog. I'll do anything you say."

Gutierrez explained that the police knew about three murders and an attempted murder. Regarding why he shot one of the victims, Gutierrez stated: "Because his son, he had beef with the barrio. I said, 'Well, I'm going to go.' So I went to the hood." (Italics omitted.) Gutierrez also described almost killing "Maria" but being stopped.

One of the informants told Gutierrez: "We're gonna get you out, but remember you're willing to do anything for me; right?" Gutierrez responded, "I'm gonna do everything, my boy." The informant clarified, "Even kill people; right?" Gutierrez replied, "Shhh, and that ain't nothing to me."

9

G. Gang evidence

Police Officer Adam Acuna testified about his experience with gangs in Baldwin Park. He had become familiar with defendant through defendant's older brothers and brother-in-law, who "were a lot more active[.]" Officer Acuna identified one of defendant's tattoos indicating his affiliation with the CWA tagging crew. It was common for a member of a tagging crew to "promot[e]" or "graduat[e]" to becoming a member of a gang in the area. However, Officer Acuna had never identified defendant as a Northside Bolen gang member. Officer Acuna also recognized Gutierrez, who had admitted to being a member of Northside Bolen.

After hearing a hypothetical similar to the murder of Vasquez as alleged in count 1 against defendant and Gutierrez, Officer Acuna opined that the murder was committed for the benefit of and in association with a criminal street gang. He opined the same about hypotheticals similar to the five other counts alleged against Gutierrez.

II. *Defendant's Evidence*

Detective Michael Valento testified that, on January 16, 2014, Mendoza had stated that a person named "Shadow" had driven the vehicle occupied by Gutierrez (presumably during the Vasquez murder). Later, Mendoza mentioned someone named "Jody[.]"

**DISCUSSION**

I. *Joint Trial with Gutierrez*

Defendant argues that the trial court abused its discretion by denying his motion to sever his trial from Gutierrez's. In a related argument, he contends that being tried with Gutierrez

violated his right to due process.  We disagree with both contentions.

A. Relevant trial court proceedings

Defendant filed a pretrial motion to sever his trial from that of Gutierrez, alternatively requesting separate juries.  As relevant to this appeal, defendant contended that "[s]everance should be granted where the jury would have difficulty in separating evidence."  Redaction of Gutierrez's out-of-court statements was insufficient to protect defendant's right to confrontation because the jury would "fill in the blanks or speculate" that Gutierrez was referring to defendant.[6]  Defendant also argued that severance should be granted pursuant to Evidence Code section 352 because "it would be more prejudicial than probative to allow codefendant statements that incriminate [defendant] to be heard by the jury," given that cross-examination would not be possible.

Following oral argument, the trial court denied the motion to sever.

---

[6]     Defendant's arguments below mostly involved the *Aranda*/*Bruton* doctrine.  (*People v. Aranda* (1965) 63 Cal.2d 518, abrogated in part by Cal. Const., art. I, § 28, subd. (d); *Bruton v. United States* (1968) 391 U.S. 123.)  "Under the so-called *Aranda*/*Bruton* doctrine, a trial court may generally not allow a jury in a joint criminal trial of a defendant and codefendant to hear the unredacted confession of the codefendant that also directly implicates the defendant—even if the jury is instructed not to consider the confession as evidence against the defendant." (*People v. Washington* (2017) 15 Cal.App.5th 19, 23.)  Defendant does not claim *Aranda*/*Bruton* error on appeal.

B. Denial of pretrial motion to sever

1. *Applicable law and standard of review*

Section 1098 provides, in pertinent part, that "[w]hen two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they *must* be tried jointly, unless the court order separate trials." (Italics added.) The Legislature has thus codified its preference for joint trials of defendants charged with the same crime or crimes. (*People v. Sánchez* (2016) 63 Cal.4th 411, 463–464 (*Sánchez*).) "Joint trials promote efficiency and help avoid inconsistent verdicts." (*Id.* at p. 464.)

The legislative preference for joint trials is, however, "subject to a trial court's broad discretion to order severance." (*People v. Thompson* (2016) 1 Cal.5th 1043, 1079.) "Factors that may bear on a trial court's decision to order separate trials include "'an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.'" [Citations.] Severance may also be appropriate where "'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" [Citations.]" (*People v. Gomez* (2018) 6 Cal.5th 243, 274 (*Gomez*).)

A trial court also has the discretion, "in the interests of justice and for good cause shown," to "order that . . . different offenses or counts set forth in the accusatory pleading be tried separately . . . ." (§ 954.) In this context, "'[t]he factors to be considered are these: (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a

12

weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case.'" (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220–1221 (*Alcala*).)

"We review a trial court's denial of a severance motion for abuse of discretion, based on the facts at the time of the trial court's ruling." (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 819 (*Daveggio and Michaud*).) "To establish an abuse of discretion, defendant[] must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.' [Citation.] A merely debatable ruling cannot be deemed an abuse of discretion." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390 (*Bryant, Smith and Wheeler*).)

### 2. *Analysis*

Count 1 was charged against both defendant and Gutierrez, thus requiring a joint trial absent a court order to the contrary. (§ 1098.) In arguing that the trial court improperly denied severance here, defendant does not focus on the factors typically relevant to whether jointly charged defendants should be tried together. (See § 1098; *Gomez, supra*, 6 Cal.5th at p. 274.) Rather, he argues that the factors usually considered in connection with severing the trial of different counts set forth in an accusatory pleading (see § 954; *Alcala, supra*, 43 Cal.4th at pp. 1220–1221) demonstrate that severance was "required" to avoid unfair prejudice.

Specifically, defendant contends that: (1) evidence introduced regarding counts 5 through 9 against Gutierrez would not have been cross-admissible if defendant was tried separately

13

on just count 1; (2) defendant was prejudiced by the spillover effect of the inflammatory evidence regarding counts 5 through 9; (3) a "weak case" against defendant was "bolstered" by six strong cases against Gutierrez; and (4) two special circumstances were alleged against Gutierrez.

The fundamental problem with each of defendant's arguments is that it overlooks that "there is a difference between when a trial court *may* order a severance and when it *must* do so." (*Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 379.) At most, defendant shows that the trial court had the discretion to order severance under section 954 or section 1098. But this merely points to a "debatable ruling" and does not establish that "the trial court's decision was so erroneous that it 'falls outside the bounds of reason[]'" such that it constituted an abuse of discretion. (*Id.* at p. 390.)

As to the cross-admissibility of evidence, "[i]n cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, . . . evidence concerning one offense or offenses *need not be admissible* as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." (§ 954.1, italics added.) Here, all counts tried together were either murder or attempted murder, which are of the same class of crimes. (*People v. Jones* (2013) 57 Cal.4th 899, 924 (*Jones*).) Thus, the lack of cross-admissibility of some evidence was "not, by itself, sufficient to show prejudice and bar joinder." (*People v. Stitely* (2005) 35 Cal.4th 514, 532.)

Nor did the possibility of a "'spillover effect,' i.e., the risk that evidence not admissible as to one of the charges, but admitted in connection with another, will affect the verdict on the

14

charge as to which it is inadmissible" (*People v. Earle* (2009) 172 Cal.App.4th 372, 387 (*Earle*)), require severance.

Two of the main concerns regarding the spillover effect are that certain charges might be unusually inflammatory and that a weak case regarding one count may be bolstered by a strong case regarding a different count. (*Earle, supra,* 172 Cal.App.4th at p. 388.) Neither concern is particularly strong in this case. Evidence regarding counts 5 through 9, alleging two murders and three attempted murders, was not likely to be more inflammatory or offensive than the evidence of the gang-related murder of Vasquez in count 1 with an AK-47. And, we disagree with defendant's contention that the case against defendant on count 1 was weak compared to that against Gutierrez on counts 1 and 5 through 9. To the contrary, the evidence that the trial court could anticipate being presented against defendant as to count 1 was strong, including eyewitness testimony and evidence that the key fob to the stolen vehicle used during the murder was found just outside of defendant's residence.

Defendant also makes a cursory argument suggesting that the fact that two special circumstances were alleged against Gutierrez rendered the denial of severance an abuse of discretion. We disagree. Even a capital case "does not automatically require severance" of other charges. (*People v. Anderson* (2018) 5 Cal.5th 372, 390.)

Finally, we note that defendant relies heavily on two cases to support his contention that severance was required. Both cases are distinguishable from the circumstances present here and neither compels reversal.

In *Calderon v. Superior Court* (2001) 87 Cal.App.4th 933 (*Calderon*), the defendant and his codefendant were to be tried

together on two jointly charged counts of premeditated attempted murder arising from one incident, as well as a count of murder and a count of attempted murder against the codefendant arising from an entirely separate incident. (*Id.* at p. 935.) After weighing various factors, the Court of Appeal concluded that the defendant would face undue prejudice from such a joint trial. (*Id.* at pp. 939–941.) Unlike here, the counts charged against the codefendant but not the defendant were highly inflammatory (involving an "execution-style murder" and a "gratuitous" attempted murder) compared to the counts against the defendant (attempted murders that "arose out of exchanged insults, with the implication of a challenge"). (*Id.* at p. 941.) Also, unlike here, the evidence against the defendant in *Calderon* was particularly weak—one victim did not identify the defendant and the other who did "got only a fleeting glimpse" in a time of great "stress" and "in the dark of night[.]" (*Ibid.*) As discussed above, in the present case, the additional counts alleged against Gutierrez were not inherently more inflammatory than the murder of Vasquez and a strong case was presented against defendant.

In *People v. Ortiz* (1978) 22 Cal.3d 38 (*Ortiz*), the California Supreme Court held that, under section 1098, "a defendant may not be tried with others who are charged with different crimes than those of which he is accused unless he is included in at least one count of the accusatory pleading with all other defendants with whom he is tried." (*Ortiz*, *supra*, at p. 43.) Accordingly, because the defendant had not been jointly charged on any count with all his codefendants, the lower court had erred when it denied his motion for severance. (*Id.* at pp. 42, 45.) Here, in contrast, there is no question that the joint-charge requirement of

16

section 1098 was satisfied:  Both defendant and Gutierrez were charged with Vasquez's murder in count 1.

Defendant has not established an abuse of the trial court's broad discretion in denying his motion to sever.

C. <u>Due process</u>

1. *Applicable law and standard of review*

We have already concluded that the trial court did not abuse its discretion when it denied defendant's pretrial motion to sever, but we "still must determine whether, in the end, the joinder of counts or defendants for trial resulted in gross unfairness depriving . . . defendant of due process of law." (*People v. Rogers* (2006) 39 Cal.4th 826, 851.)  "Defendant[] bear[s] the burden of establishing that the trial was grossly unfair and denied [him] due process of law, and 'a judgment will be reversed on this ground only if it is "reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt."'" (*Daveggio and Michaud, supra*, 4 Cal.5th at p. 821.)

We review this claim de novo.  (See *In re Jonathan V.* (2018) 19 Cal.App.5th 236, 241 ["We review procedural due process claims de novo because 'the ultimate determination of procedural fairness amounts to a question of law[]'"].)

2. *Analysis*

Defendant points to numerous examples from his trial that he contends rendered it grossly unfair and a violation of due process to be tried alongside Gutierrez.  These include the admission of graphic photographs and descriptions of the crimes charged in counts 5 through 9; excerpts from the prosecutor's opening and closing statements speaking generally about defendant and Gutierrez and all of the counts; and prejudicial association with Gutierrez based on Gutierrez's callous attitude

17

toward his crimes and his disclosure to the undercover informants that he was "illegal" and on an immigration hold.

Several factors lead us to conclude that no due process violation occurred.

First, the evidence of defendant's guilt as to count 1 was very strong. Indeed, defendant does not argue that there was insufficient admissible evidence to support his conviction. Mendoza identified defendant as the driver of the stolen Mercedes used during the commission of Vasquez's murder. Gutierrez—defendant's front seat passenger—had an AK-47 with him in the car. Lest there be any doubt that defendant knew that Gutierrez was armed, prior to the murder Gutierrez told Mendoza, from the car that defendant was driving, that he was. Following the shooting, defendant fled the scene with Gutierrez and went to Bennett's house, where he was part of an "excited" group discussing the murder. And, the key fob of the stolen Mercedes used during the murder was found outside of defendant's residence. "[G]iven the strength of the independent evidence against . . . defendant[], we perceive no reasonable likelihood that the jury was influenced by the joinder in its verdict of guilt." (*Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 821.)

Second, while it is certainly true that most, if not all, of the graphic evidence of the crimes alleged against Gutierrez in counts 5 through 9 would not have been shown to the jury if defendant had been tried alone, we cannot say that this rendered the trial grossly unfair. In addressing a similar argument, the California Supreme Court has observed that "the primary error in such a claim is [the] defendant's 'characterization of the issue presented here as affecting *his* trial, as opposed to the *actual* trial

18

in this case—the joint trial . . . .' [Citation.] In other words, the issue is not whether a theoretical separate trial of one defendant would have been different, but whether the joint trial that actually occurred was in some manner prejudicially unfair or unreliable." (*Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 380–381.)

In defendant's actual trial with Gutierrez, each count tried involved a violent crime with graphic evidence. The murder of Vasquez alleged in count 1 was no exception. The jury heard testimony that Vasquez "looked pale" and "had very shallow breathing" when law enforcement responded to the scene. The jury heard that blood was "oozing out on the driveway" and saw a photograph depicting Vasquez's wounds and blood. The deputy medical examiner who conducted Vasquez's autopsy described, in detail, the trajectory of the numerous gunshot wounds through Vasquez's body.

The evidence regarding the other counts alleged against Gutierrez was not so inherently more disturbing or inflammatory that the jury would be influenced by it to find defendant guilty of Vasquez's murder.

<u>Third</u>, and finally, we are unconvinced that prejudicial association of defendant with Gutierrez rendered the jury unable to fairly assess defendant's individual culpability. "Prejudicial association might exist if 'the characteristics or culpability of one or more defendants [is] such that the jury will find the remaining defendants guilty simply because of their association with a reprehensible person, rather than assessing each defendant's individual guilt of the crimes at issue.'" (*Sánchez, supra*, 63 Cal.4th at p. 464.)

19

Significantly, the jury acquitted Gutierrez of the murder of Quintanilla as alleged in count 9. This indicates that the jury could and did put aside the evidence that Gutierrez committed two other murders and three attempted murders, as well as the graphic eyewitness and autopsy evidence regarding Quintanilla. It shows that the jury assessed the evidence relevant to each count separately and differentiated between the various alleged crimes. (See *Gomez, supra*, 6 Cal.5th at p. 277 [the fact that the jury acquitted the defendant of one charge and could not reach a verdict on other charges "tend[s] to show that 'the jury was capable of, and did, differentiate among [the defendant's] crimes'"]; *Jones, supra*, 57 Cal.4th at p. 927 [a jury's failure to reach a unanimous verdict on some counts shows the jury's ability "to consider each case on its individual merits"].) If the jury could differentiate between the various counts alleged against Gutierrez, we are even more confident that it could differentiate defendant's culpability from that of Gutierrez.

The joint trial did not deprive defendant of his right to due process.

II. *No Instructional Error*

Defendant raises two claims of instructional error.

First, defendant argues that the trial court erred by failing to sua sponte instruct the jury that it could not consider, in relation to defendant's guilt on count 1, evidence regarding counts 5 through 9 against Gutierrez. Defendant argues, in the alternative, that his trial counsel was ineffective for not requesting such a limiting instruction.

Second, defendant argues that the trial court erred by failing to instruct the jury that it must find each element of the charge beyond a reasonable doubt.

20

We find no instructional error.

A. Standard of review

We review claims of instructional error and ineffective assistance of counsel de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 [instructional error]; *People v. Mayfield* (1993) 5 Cal.4th 142, 199 [ineffective assistance of counsel].)

B. Limiting instruction

Pursuant to Evidence Code section 355, "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Italics added.) If not requested, the trial court has no sua sponte duty to give such a limiting instruction.[7] (*People v. Cowan* (2010) 50 Cal.4th 401, 479; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051–1052 (*Hernandez*).)

Here, assuming that evidence regarding the counts alleged against Gutierrez but not defendant was inadmissible against defendant, defendant failed to request a limiting instruction regarding that evidence. Accordingly, the trial court did not err in failing to give a limiting instruction when none was requested.

We also reject defendant's claim that his trial counsel was ineffective for failing to request a limiting instruction.

---

[7] "There is a 'possible' narrow exception in the '"occasional extraordinary case"' in which the evidence '"is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose."' [Citations.]" (*People v. Murtishaw* (2011) 51 Cal.4th 574, 590.) This is not such an extraordinary case, as the evidence admitted regarding the counts against Gutierrez not involving defendant did not constitute a dominant part of the evidence against defendant. (See *People v. Valdez* (2012) 55 Cal.4th 82, 139.)

To establish ineffective assistance of counsel, a defendant must show that counsel's performance was both deficient and prejudicial. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) "[A] reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. . . . On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Ibid*.) None of these circumstances warranting reversal is present here.

"A reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide." (*People v. Maury* (2003) 30 Cal.4th 342, 394.) After all, the jury was already instructed with CALCRIM No. 203 that it "must separately consider the evidence as it applies to each defendant" and that it "must decide each charge for each defendant separately."

An additional limiting instruction regarding evidence of counts 5 through 9 against Gutierrez "properly might explain how it *could* be used [against defendant] as well as how it could not be used." (*Hernandez, supra*, 33 Cal.4th at p. 1053.) For example, defendant contends that his trial counsel should have objected to or requested limiting instructions about Bennett's statements and Mendoza's testimony about crimes unrelated to the Vasquez murder. But doing so could have highlighted the substantial parts of this evidence that were in fact related to the Vasquez murder and admissible as to defendant. Thus, a rational, tactical reason existed for trial counsel to refrain from

requesting a more detailed limiting instruction regarding specific evidence.

C. Reasonable doubt instruction

The trial court instructed the jury with CALCRIM No. 220 regarding reasonable doubt. That instruction explains, in part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt." Defendant contends that CALCRIM No. 220 was inadequate because it did not specify that the jury must find each element of the offense proven beyond a reasonable doubt.

Defendant failed to object to or request an amplification of CALCRIM No. 220 as given, thus forfeiting his claim of error. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 911 (*Covarrubias*).)

Forfeiture aside, the California Supreme Court has previously rejected a similar argument. (*Covarrubias*, *supra*, 1 Cal.5th at p. 911 [rejecting contention that "CALJIC No. 2.90 is inadequate because it fails to inform jurors that 'every element' of the charges must be proved beyond a reasonable doubt"].) As defendant concedes, we are bound by this precedent (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455) and must therefore reject defendant's claim.

III. *No Cumulative Error*

Defendant argues that the cumulative impact of the alleged errors violated his due process rights and requires reversal of the judgment. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant. [Citations.] Although a defendant is entitled to a fair trial, he or she is not entitled to 'a perfect one.'" (*People v. Capers*

23

(2019) 7 Cal.5th 989, 1017.)  Here, defendant has not established any error to aggregate.

IV. *Parole Ineligibility*

Defendant contends that the trial court erred when it imposed a 15-year parole ineligibility term for the gang enhancement under section 186.22, subdivision (b)(5).  The People agree.  We agree with the parties.

When, as here, a trial court imposes a 25-year enhancement pursuant to section 12022.53, subdivision (d), based on a violation of section 186.22, subdivision (b), the trial court may not also impose the parole ineligibility term set forth in section 186.22, subdivision (b)(5), unless the defendant personally used or discharged a firearm.  (See *People v. Brookfield* (2009) 47 Cal.4th 583, 593–594 ["*accomplices* to a gang-related offense specified in section 12022.53 in which, as here, not the defendant but another principal personally used or discharges a firearm . . . . are subject to additional punishment under *either* section 12022.53 *or* the gang-related sentence increases under section 186.22, but not *both*"].)

Gutierrez personally used a firearm to kill Vasquez, not defendant.  Accordingly, the 15-year parole ineligibility term must be stricken.  As an inmate imprisoned for life, defendant should instead receive a seven-year parole ineligibility term. (§ 3046, subd. (a)(1).)

**DISPOSITION**

As to count 1, the section 186.22, subdivision (b)(5), 15-year parole ineligibility term is stricken and a seven-year ineligibility term is imposed pursuant to section 3046, subdivision (a)(1).  As modified, the judgment is affirmed.

The trial court shall prepare and file an amended abstract of judgment reflecting defendant's corrected sentence.  Copies of the amended abstract shall be forwarded to the Department of Corrections and Rehabilitation.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT