Filed 6/13/25  P. v. Pacheco CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D083031 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE395975) |
| OMAR ENRIQUE PACHECO, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Daniel G. Lamborn, Judge.  Affirmed as modified.

Belinda Escobosa, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

Omar Enrique Pacheco appeals from his convictions and certain fines and fees imposed at sentencing.

For the convictions arising from his assault of his former partner, Pacheco takes issue with an expert's testimony—in response to defense counsel's question—that in her past investigations she had never encountered a domestic violence victim whose recantation was true. He argues the trial court erred by not sua sponte instructing the jury on the limited use of expert testimony on intimate partner battering. But we conclude the court had no duty to give a limiting instruction absent a request. As for Pacheco's alternative claim his trial counsel was deficient in failing to request such an instruction, we discern no error cognizable on direct appeal nor any prejudice. The court's other instructions gave substantially the same guidance, and a major inconsistency in the victim's recantation supported the jury instead believing the victim's original account.

Pacheco also contends the trial court incorrectly calculated certain fines and fees for all his convictions. The People agree on the fact of error for some fines and fees but not on what the proper amount should be. We conclude the People's calculations, which incorporate mandatory penalties, are correct.

We thus modify the judgment to correct some of the fines and fees but otherwise affirm.

## I.

Pacheco was charged with willful infliction of corporal injury on someone with whom he had a dating relationship (Pen. Code, § 273.5, subd. (a); count 1); assault by means likely to produce great bodily injury (§ 245(a)(4); count 2); false imprisonment by violence, menace, fraud, or deceit (§§ 236, 237(a)); count 3); making a criminal threat (§ 422; count 4); vandalism under $400 (§ 594(a), (b)(2)(A); count 5); violation of a protective order resulting in physical injury (§ 273.6(a), (b); count 6); manufacturing a

2

controlled substance (Health & Saf. Code, § 11379.6(a); counts 7, 9, & 10); and violation of a protective or stay-away order (§ 166(c)(1); counts 8 & 11).

The facts of counts 1 through 6, which stem from the same September 2019 event, are relevant to this appeal.

## A.

Pacheco and Gabriela M. dated for about seven years.

Gabriela obtained a restraining order against Pacheco in March 2019, yet the two continued their relationship.

## B.

On September 10, 2019, Gabriela went to a police station to report a domestic violence incident. That day, she relayed what happened to her three different times.

## 1.

First, an officer took Gabriela's statement at the station before she went to the hospital. Gabriela was "very upset" and "crying." "She had visible injuries to her neck" and "pretty substantial petechiae"—burst blood vessels that can occur in "more significant strangulation cases"—"around her eyes" and on her face.

Gabriela told the officer Pacheco had inflicted her injuries. She had not seen Pacheco for a while because of the restraining order, but then they "reunited." Gabriela explained she was at Pacheco's house that day when they started arguing and he "went crazy" on her. Pacheco threw beer "all over" her. When Gabriela began collecting her things to leave, Pacheco broke her phone. She ran out of the house, but Pacheco caught up to her and "dragg[ed] [Gabriela] by [her] hair." "He wouldn't let [her] leave." Pacheco strangled Gabriela with maximum force "on and off" maybe five or six times. He used two hands in a "choke hold" and also held his knee to her neck.

3

While strangling her, Pacheco told Gabriela he was "going to kill" her. "[F]or a minute," Gabriela "couldn't breathe," and she thought she lost consciousness.

## 2.

Second, a pair of detectives spoke with Gabriela in the hospital emergency room. Gabriela mentioned the restraining order and how she and Pacheco "got in contact" recently. She had gone over to Pacheco's house the night before. In the morning, they were talking when Pacheco "snapped" and went "just crazy" on her. Pacheco "wouldn't let [Gabriela] leave" and "had [her] keys in his pocket." At one point, he tried to tie her up. At another, Pacheco "threw beer all over" her. Gabriela tried running out the back door, but Pacheco "chased after" her, "grabbed" her "by the hair," and "dragged" her back into the house. He broke Gabriela's phone, so she had "no way to call anybody." Inside the house, Pacheco strangled Gabriela "multiple times," "maybe four times, five times." Gabriela was on the ground on her back while Pacheco was on top of her with "[b]oth hands" around her neck. Gabriela felt she lost consciousness "for a second."

When a detective asked if "any weapons" were used, Gabriela said Pacheco pointed "a BB gun or a soft or like a pellet gun"; she described two guns: a long one and a handgun.

After the interview, the detective obtained a search warrant and searched Pacheco's home, where he seized two guns: "a B.B.-style rifle" and "a B.B.-style revolver."

## 3.

Third, a forensic nurse examined and interviewed Gabriela. Gabriela identified Pacheco as her assailant. She said she woke up and she and Pacheco "started arguing." Then Pacheco "snapped" and grabbed her by the

4

hair and "threw" her to the floor. He started strangling Gabriela "multiple times," including while on top of her with two hands over her neck so Gabriela "couldn't breathe." At one point, Pacheco grabbed Gabriela's hands to try to tie her up. When Gabriela ran out the back door, Pacheco "grabbed her by her hair, and he took her back inside." She told the nurse Pacheco "wouldn't let [her] leave" and had her keys in his pocket. As Pacheco strangled Gabriela, he said he "was going to kill" her. Gabriela "couldn't breathe." When asked about firearms, Gabriela told the nurse "a rifle pellet gun and airsoft gun[ were] maybe pointing at me when I was on the floor."

The nurse observed Gabriela's "numerous injuries," including "a lot of defuse petechiae . . . all over her face" and "some bruising on each side of her neck and some redness on the front" indicative of "trauma" from when "something is pressed against" it. Gabriela's right eye had a hemorrhage consistent with "trauma of deprived oxygen through strangulation." The nurse confirmed petechiae and hemorrhaging are "consistent with having been strangled" and the injuries were consistent with Gabriela's account.

C.

Nearly three years later, when testifying at Pacheco's preliminary hearing, Gabriela disclaimed her original account of the incident as "incorrect" and "not true."

Gabriela claimed she "showed up to [Pacheco's] home unannounced, and there was another female there." Despite not knowing the woman, seeing her made Gabriela "really angry," and the two started arguing. The argument escalated into a physical fight when the woman "grabbed [Gabriela] by [her] hair." The two started hitting each other, and the woman strangled Gabriela. Though "it was kind of like a blur," Gabriela remembered Pacheco "getting" the other woman "off of me . . . just pulling her

5

off of me." This other woman—not Pacheco—broke Gabriela's phone, told Gabriela she was going to kill her, and caused Gabriela's injuries.

On cross-examination, Gabriela confirmed Pacheco tried to intervene by pulling the other woman off her.

D.

At trial, the jury received Gabriela's accounts from the day of the incident as well as her preliminary hearing testimony.

Gabriela also testified at trial. By that time, Gabriela was married to someone else. Gabriela repeatedly told the jury she lied in her initial reports. She explained she and Pacheco argued the night before the incident because Gabriela thought he was cheating on her. Like at the preliminary hearing, Gabriela testified she "showed up" to Pacheco's house unannounced the next day and found another woman there. Gabriela thought the woman was seeing Pacheco "behind [her] back." Gabriela blamed her injuries on the woman, saying they got into "an altercation" and the woman strangled her.

Yet in this version of events, Pacheco "wasn't there at the time" of the fight. When confronted with the discrepancy, Gabriela explained she "just forgot what happened" and "made a mistake" at the preliminary hearing. It "wasn't true" that Pacheco pulled her and the other woman apart during their fight.

On cross-examination, Gabriela revealed a total of four people were present at Pacheco's house when she arrived: the woman who assaulted her, the woman's father, and two other people. Once Gabriela and the woman started arguing, however, the other three people left. When the prosecutor noted Gabriela never before mentioned these other people, Gabriela responded she "didn't think [she] had to say anything."

6

According to Gabriela, she lied about Pacheco assaulting her because she was mad, jealous, and hurt, and she wanted him to "feel [her] pain." Gabriela testified she "wanted to tell the truth" because she did not want the lie "on [her] conscience." She never told law enforcement her original report was fabricated because "nobody came back" with an update or to ask questions.

E.

Detective Christine Penwell, an investigator for the family protection unit of the district attorney's office, testified as an expert for the prosecution. In her career, she had been part of over 2,000 domestic violence case investigations and had interviewed thousands of domestic violence victims.

Penwell testified that, in her experience, domestic violence victims "quite often," "for various reasons, either refuse to cooperate or minimize what occurred or recant their story completely." Some common versions of victim recantations Penwell had seen include "a victim who [is] saying I was the one who started it, . . . I did something . . . to the abuser to make him strike me, or I lied to the officers because I wanted to get him in trouble."

On cross-examination, Penwell shared she had in past investigations "had the victim come back and say I recanted, but my recantation is a lie, and [the abuse] actually happened." When defense counsel asked if she had ever encountered a victim whose "recantation is the truth," Penwell responded, "No."

F.

In closing arguments, the prosecutor focused on the credibility of Gabriela's various accounts. He emphasized the consistency between what Gabriela told law enforcement and the forensic nurse the day of the incident compared to the inconsistency of her in-court testimony disclaiming Pacheco

7

as her abuser.  The prosecutor mentioned Penwell's testimony only once, when explaining "why victims recant: they're scared, they still love the person, they feel guilty themselves about getting them into trouble."

## G.

The jury convicted Pacheco on all charges.

The court sentenced Pacheco to a total of five years and eight months in prison.  It also imposed various fines and fees.

## II.

Pacheco claims error based on (1) the trial court not instructing the jury—on its own, without a request from counsel—with CALCRIM No. 850 about the limited use of expert testimony on the effects of intimate partner battering; (2) alternatively, defense counsel's ineffective assistance for not requesting the limiting instruction; and (3) how the court calculated certain fines and fees imposed at sentencing.  We address each point in turn.

## A.

Pacheco argues the facts of this case obligated the court to instruct the jury sua sponte with CALCRIM No. 850, which limits the use of expert testimony on the effects of intimate partner battering.  We disagree the court was required to give a limiting instruction absent a request.

We review de novo whether the trial court has a duty to give a particular jury instruction.  (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

Expert testimony on intimate partner battering, including its effect on the behavior of victims of domestic violence, is admissible except when offered to prove the charged abuse occurred.  (Evid. Code, § 1107(a).)

While *People v. Housley* (1992) 6 Cal.App.4th 947, 959, expressly imposes a sua sponte duty to give the type of limiting instruction at issue here "in all cases" where an expert testifies about an analogous psychological

8

syndrome, we agree with another case that statutory and decisional law require the instruction be given only if requested. (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1071-1074.)

The Legislature imposes only one mandatory instruction on expert testimony, which is captured by CALCRIM No. 332 and was given here. (See § 1127b.) "No further instruction on the subject of opinion evidence need be given." (*Ibid.*)

When, as here, evidence is admissible for one purpose but not another, "the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Evid. Code, § 355, italics added.) "Absent a request," however, "a trial court generally has no duty to instruct as to the limited purpose for which evidence has been admitted." (*People v. Murtishaw* (2011) 51 Cal.4th 574, 590 [cleaned up].) Consistent with that general rule, in the specific context of intimate partner battering, our Supreme Court has suggested "an additional limiting instruction *might* also be appropriate *on request.*" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1088, fn. 5, italics added.) We thus find *Mateo* more persuasive than *Housley* on this point.

Indeed, not even Pacheco argues for the sua sponte obligation to give the limiting instruction "in *all cases*" where this type of expert testimony is presented. Instead, he contends "the circumstances of the present case required the trial court on its own motion to instruct the jury on the limited use of Penwell's testimony." Not so.

"This was not an extraordinary case in which the unprotested evidence was *both* highly prejudicial *and* minimally relevant to any legitimate purpose, *and* was a dominant part of the evidence against the accused," such that it would trigger the "hypothetical exception to the rule generally

9

rejecting a sua sponte duty." (*People v. Farnam* (2002) 28 Cal.4th 107, 163-164 [cleaned up].) Penwell never testified she knew Gabriela or Pacheco or anything about their relationship. Penwell did not, as Pacheco claims, "opine[ ] on the central issue in this case—whether [Pacheco] battered" Gabriela, as such testimony would be inadmissible. (See Evid. Code, § 1107(a).) Pacheco seems to implicitly acknowledge as much in reply, as he backs away from that initial claim and instead asserts Penwell "conclusively opined on the untruthfulness of a domestic violence victim's recantation." Yet even that characterization may stretch beyond Penwell's testimony. Defense counsel asked if, *in her past cases*, Penwell had ever encountered a victim whose recantation was "the truth," and Penwell said no. She never testified *no* recantation is *ever* true, and she never offered an opinion about Gabriela or Pacheco. And the exception seems particularly inapt here, where the offending testimony was elicited by defense counsel "not against defendant but [o]n his behalf." (*Murtishaw*, 51 Cal.4th at p. 590.)

Because Pacheco has not established the court had a sua sponte duty to give CALCRIM No. 850 or a similar limiting instruction, he has not established any error from the lack of such instruction.

B.

Alternatively, Pacheco argues his trial counsel's failure to request an instruction limiting the use of Penwell's testimony violated his right to effective assistance of counsel. We disagree.

To establish ineffective assistance, an appellant must show (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)

On the first prong, though Pacheco claims "no satisfactory rationale" exists, the record's silence as to trial counsel's reasons for not requesting a

10

limiting instruction gives us "'no basis'" to resolve this question on direct appeal. (*People v. Jasso* (2025) 17 Cal.5th 646, 678.) "Habeas proceedings are the appropriate avenue for evaluating claims of ineffective assistance of counsel." (*Id.* at p. 676.) "There, a more complete record can be made to either support or refute the usual presumption that counsel's decisions reflect reasonable professional judgment." (*Id.* at p. 678.) This alone is reason to reject Pacheco's claim.

On the second prong, Pacheco has not met his burden to prove he would have obtained a more favorable result had CALCRIM No. 850 been given. CALCRIM No. 850 would have informed the jury that, while the expert's testimony about the effects of intimate partner battering relate to a pattern of behavior that may be present in domestic abuse cases, that testimony (1) "is not evidence that the defendant committed any of the crimes charged" and (2) may be considered "only in deciding" if the victim's conduct "was consistent with someone who has been abused and in evaluating the believability of her testimony."

The court's other instructions achieved substantially the same purpose. The jurors were instructed to "decide what the facts are. It is up to all of you, and you alone, to decide what happened." (See CALCRIM No. 200.) As a result, the jurors could not abdicate that responsibility to the expert. The jurors "alone"—not the expert—"must judge the credibility or believability of the witnesses." (CALCRIM No. 226.) The court instructed the jurors they could believe "all, part, or none of any witness's testimony," considering factors such as whether the witness "ma[d]e a statement in the past that is consistent or inconsistent with his or her testimony." (*Ibid.*; see also CALCRIM No. 318.) Specific to expert testimony, the jurors were instructed that they were "not required to accept" the expert's opinions "as true or

11

correct," and instead jurors could "disregard any opinion that [they] find unbelievable, unreasonable, or unsupported by the evidence." (CALCRIM No. 332.) "We presume that jurors understand and follow the court's instructions." (*People v. Pearson* (2013) 56 Cal.4th 393, 414.) Though not tailored to intimate partner battering, like CALCRIM No. 850, these instructions provided the same guardrails for how the jury could consider evidence.

Pacheco argues "at least one juror could easily have been convinced that [Gabriela] lied in her initial report . . . and her trial testimony was truthful," as Gabriela's testimony about lying to get Pacheco in trouble "was reasonable" given the couple's "complicated relationship." He also discounts her initial reports because they were not made under oath.

Yet the record gave the jury sufficient reason to discredit Gabriela's recantation. As outlined above, key details were largely consistent across Gabriela's three accounts the day of the incident. Gabriela gave much more information about the specifics of the abuse—like how she was strangled—in her initial reports compared to her trial testimony, and her injuries were consistent with those reports. We agree with the People that, in contrast, Gabriela's under-oath accounts "differed in significant respects" between the preliminary hearing and trial. Despite blaming her injuries on another woman in both instances, in one version Pacheco pulled the woman off Gabriela while in the other version Pacheco was nowhere to be found and three other people left just as the fight turned physical. The jury—who could observe Gabriela's demeanor while she testified at trial—reasonably could have discredited the explanation that she "just forgot what happened" and "made a mistake" at the preliminary hearing.

We thus perceive no prejudice from CALCRIM No. 850's absence.

12

Lastly, Pacheco challenges certain fines and fees the court imposed. At sentencing, the court imposed restitution fines under Penal Code sections 1202.4(b) and 1202.45 as well as "[t]he other fines and fees in the probation report." The People agree certain fines and fees were improperly calculated, but they differ on the proper amounts for some. We start with the fees and fines on which the parties agree before explaining why we conclude the People's calculations for the others are correct.

Appellate courts may correct legal errors resulting in an unauthorized sentence. (*People v. Smith* (2001) 24 Cal.4th 849, 852.) When a court errs with respect to a statutorily mandated fine that does not involve a discretionary sentencing choice, it results in an unauthorized sentence. (See *id.* at pp. 852-853.)

The parties agree the court operations assessment fee under Penal Code section 1465.8 should have been $440 instead of the $640 the court imposed. The statute requires a $40 assessment for "every conviction for a criminal offense," subject to inapplicable exceptions. (§ 1465.8(a)(1).) For Pacheco's convictions on all 11 counts, we agree this assessment should total $440.

Similarly, for the conviction assessment fee under Government Code section 70373, which imposes a fee of $30 per conviction, we agree the court should have assessed a total fee of $330 rather than $480.

The court imposed a $41 theft fine under Penal Code section 1202.5, which applies when a defendant is convicted of one of the enumerated offenses. Although the parties agree Pacheco "was not convicted of any of the enumerated offenses," section 1202.5 covers Pacheco's vandalism-under-$400 conviction under section 594 for count 5. (§ 1202.5(a).) Even so, at

sentencing the court determined "no further fines or fees" would be imposed for that count. Because the oral judgment controls over the abstract of judgment, we will modify the judgment to strike the theft fine under section 1202.5. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185, 188.)

While the parties agree the court erred by imposing $205 for the laboratory analysis fee under Health and Safety Code section 11372.5, they disagree on the proper calculation. Under section 11372.5(a), a defendant convicted of specific code violations—including of Health and Safety Code section 11379.6—"shall pay a criminal laboratory analysis fee" of $50 "for each separate offense." Pacheco was convicted of three counts of manufacturing a controlled substance in violation of section 11379.6. In his opening brief, he argues the $50 fee should be multiplied by the number of qualifying counts, which would total $150. But as the People contend, that calculation omits mandatory penalties. Thus, each $50 fee was also subject to the following mandatory penalties: a $50 state penalty under Penal Code section 1464(a)(1); a $35 county penalty under Government Code section 76000(a)(1); a $10 state surcharge under Penal Code section 1465.7(a); a $25 state court construction penalty under Government Code section 70372(a)(1); a $10 emergency medical services penalty under Government Code section 76000.5(a)(1); a $5 deoxyribonucleic acid penalty under Government Code section 76104.6(a)(1); and a $20 state-only forensic laboratories penalty under Government Code section 76104.7(a). (See *People v. Sharret* (2011) 191 Cal.App.4th 859, 863-864.) In reply, Pacheco appears to concede these mandatory penalties, yet he faults the prosecutor for not alerting the court about them and claims that inaction "forfeited [this] claim of error on appeal." But we may review unauthorized sentences even absent

14

an objection at trial.  (*Smith*, 24 Cal.4th at p. 852.)  All told, the mandatory fee and penalties amount to $205 per offense, for a total of $615 here.

The last fee at issue—the drug program fee under Health and Safety Code section 11372.7—implicates the same three counts of manufacturing a controlled substance.  It imposes a fee of up to $150 "for each separate offense."  (Health & Saf. Code, § 11372.7(a).)  It is also subject to penalties totaling $465: a $150 state penalty under Penal Code section 1464(a)(1); a $105 county penalty under Government Code section 76000(a)(1); a $30 state surcharge under Penal Code section 1465.7(a); a $75 state court construction penalty under Government Code section 70372(a)(1); a $30 emergency medical services penalty under Government Code section 76000.5(a)(1); a $15 deoxyribonucleic acid penalty under Government Code section 76104.6(a)(1); and a $60 state-only forensic laboratories penalty under Government Code section 76104.7(a).  (See *Sharret*, 191 Cal.App.4th at p. 864.)  Here, the court appears to have imposed the drug program fee and associated penalties for one count only, for a total of $615.  Unlike the laboratory analysis fee, however, the court had discretion not to impose the drug program fee on any or all of the counts, as a defendant "shall not be required to pay a drug program fee" if the court determines the defendant does not have the ability to pay it.  (Health & Saf. Code, § 11372.7(b).)  "On a silent record, as here, we presume the trial court found defendant did not have the ability to pay a second [or third] drug program fee as to" the remaining two counts.  (*Sharret*, at p. 864.)  Accordingly, we discern no error in the $615 imposed here for the drug program fee.

## III.

We modify the judgment to: (1) strike the $41 theft fine under Penal Code section 1202.5; (2) impose a court operations assessment fee under

15

Penal Code section 1465.8 of $440; (3) impose a conviction assessment fee under Government Code section 70373 of $330; and (4) impose a laboratory analysis fee under Health and Safety Code section 11372.5 of $615.

As modified, the judgment is affirmed. The court shall forward a certified copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.


CASTILLO, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.

16